UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 7:19-CV-00403 |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| WE BUILD THE WALL, INC, ET AL, | ) | Thursday, December 5, 2019 |
| | ) | |
| Defendants. | ) | (1:44 p.m. to 2:42 p.m.) |


HEARING

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For Plaintiff:            PAXTON WARNER, ESQ.
                         DANIEL HU, ESQ.
                         JOHN SMITH, ESQ. (PHONE)
                         Assistant United States Attorney
                         1701 W. Business Hwy. 83
                         Suite 600
                         McAllen, TX 78501


For Defendants:          KRIS KOBACH, ESQ. (PHONE)
                         RICHARD KAYE, ESQ. (PHONE)
                         DAVID OLIVERA, ESQ. (PHONE)
                         TIM PRIEBE, ESQ. (PHONE)

Court Recorder:          Rick Rodriguez

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, Texas 78468
                         361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**McAllen, Texas; Thursday, December 5, 2019; 1:44 p.m.**</u>

<u>**(Call to Order)**</u>

**THE COURT:** All right. Let me call for announcements. Let's see. United States of America versus We Build the Wall, Inc., et al. Fisher Industries I think is also a defendant. If I can get announcement from the government first.

**MR. WARNER:** Yes, your Honor. Paxton Warner on behalf of the United States, as well as Daniel Hu and then also on the phone is John Smith from Corpus Christi.

**THE COURT:** For the government. All right.

And so who is on the phone for the defendants? And if you could identify your name and who you represent.

**MR. KOBACH:** Yes, your Honor. Kris Kobach, general counsel for We Build the Wall. Also with me on the phone is Richard Kaye and David Olivera.

**THE COURT:** All right. And all from the Florida area or is this the David Olivera that I know from the McAllen area?

**MR. KOBACH:** David is local counsel.

**THE COURT:** Oh, okay, all right.

**MR. KAYE:** Yeah, I am --

**THE COURT:** Make sure it wasn't a coincidence.

**MR. KAYE:** Your Honor, this is Richard Kaye. I'm with the law firm of Barnes and Thornburg. And although we have a Dallas office, I'm in the Atlanta office.

1          **THE COURT:**  All right.  And you indicate you-all

2    represent We Build the Wall but I also have the defendants

3    Fisher --

4          **MR. KATE:**  That's correct.

5          **THE COURT:**  -- Fisher Industries, Fisher Sand and

6    Gravel and Neuhaus and Sons that were also named in the

7    complaint.  Are they represented here this afternoon?

8          **MR. COURTOIS:**  Yes, your Honor.  Mark Courtois at

9    Funderburk Funderburk Courtois in Houston for Fisher Industries

10    and Fisher Sand and Gravel Company.  And Tim Priebe who's

11    general counsel for Fisher Industries is on the phone also.

12          **THE COURT:**  All right.  Anybody here for Neuhaus and

13    Sons, LLC?

14          **MR. WARNER:**  That's the one party I haven't gotten

15    ahold of, your Honor.  That is the landowner.

16          **THE COURT:**  Sure.

17          **MR. WARNER:**  They're actually where the construction

18    is going on.  So he was the one I was not able to get ahold of.

19          **THE COURT:**  In private practice 20 years ago I did

20    some work so I'm familiar with some of those new house

21    entities.  And Mr. Vaughn (phonetic), in particular, I can

22    recall.

23          **MR. WARNER:**  Mr. Vaughn is his agent, his registered

24    agent.  We're trying to get him served this afternoon, your

25    Honor.

1     **THE COURT:**  Okay.  All right.  So I have read

2   90 percent of the materials that have been filed.  A lot of

3   stuff came in over the noon hour and I had some commitments

4   already.  So I think I've gotten through all of that though.

5           I've also tried to figure out on my own where the

6   heck this is, looking at a Google map trying to figure out from

7   the little bits of information that were supplied, where

8   exactly this is on the river.  There was a link to a video on

9   the website of We Build the Wall that I looked at where it

10  looked like a foreperson with a construction cap on.  There was

11  some dirt moving equipment in the background.  There was this

12  gentleman was speaking.  I presume that was this location but I

13  don't know that.

14          **MR. WARNER:**  That is correct, your Honor.  So this is

15  about a mile west of Anzalduas Park.  It's a massive peninsula

16  where the river bends around.  And I don't know if the court is

17  familiar where Military actually comes up and meets the IBWC

18  levy.  And then the levy is actually the road for just a little

19  space of time there but basically just south of the Mission

20  area.

21          **THE COURT:**  Okay.  So this is almost directly south

22  of the National Butterfly Center but on the other side of the

23  levy.

24          **MR. WARNER:**  So the Butterfly Center is to the west

25  of this by I believe two tracts of land.

1      **THE COURT:**  All right.  Let me see if I can switch to

2  my computer.

3      **(Pause)**

4         This is not really working.  Here we go.  Okay.  It's

5  working now.

6         **MR. WARNER:**  This is right here (indicating), Judge.

7  This is the boundary line and this is the boundary line and

8  this is the river.

9         **THE COURT:**  So tell me --

10        **MR. WARNER:**  So maybe less than a mile from

11 Anzalduas.

12        **THE COURT:**  So this is the peninsula that you're

13 speaking of (indicating)?

14        **MR. WARNER:**  Correct, your Honor.

15        **THE COURT:**  And I apologize to outside counsel.  I

16 could have probably Skype'd you-all in with a little more

17 planning so you could see what's on the video projector but

18 it's just a Google overhead of the river and adjacent land in

19 this -- in the area south of Mission.  Do -- let's say -- I

20 would say southeast of the birding center or the Butterfly

21 Center.

22        **MR. WARNER:**  Right.  Butterfly would be here

23 (indicating).

24        **THE COURT:**  Yes, I see that.  So okay.  It looks as

25 though in the video I saw on the website that there was some

1  construction or at least movement of vegetation adjacent to the

2  actual river.  I could see water in the background.  Was that

3  the river or was that a lake or a pond?

4          MR. WARNER:  That's the river, your Honor.

5          THE COURT:  Okay.  So where on this map was that?

6          MR. WARNER:  They are clear cut all the way around

7  the peninsula and all the way back up the western side.

8          THE COURT:  Okay.

9          MR. HU:  We've got some photos for you, Judge, that

10  we'll be happy to show you.  And we've already supplied these

11  to opposing counsel.

12          THE COURT:  Okay.  Aerial?

13          MR. HU:  Your Honor, taken around a little bit

14  earlier this morning.

15          THE COURT:  Okay.

16          MR. WARNER:  So for counsel on the phone -- oh, your

17  Honor, could we switch?

18          THE COURT:  Oh, sure.

19          MR. WARNER:  Sorry.  I'm showing the court what I

20  emailed as Exhibit 1 of the pictures.  So your Honor, this is

21  -- this morning the river is in the background.  And as the

22  court can see, there's like rebar material in a trench on the

23  ground right here (indicating).

24          THE COURT:  Okay.  This -- wow.  I mean, this looks

25  -- I look at this and it looks like a snow scene.  Is that

1    just --

2            **MR. WARNER:**  So it was -- sorry, your Honor, it was

3    through a window.  So that's why but that's the river, that's

4    the Mexican side of the -- on the top part of the picture.

5            **THE COURT:**  Okay.  So behind this rebar and this side

6    of the river there's to be stacks of -- what are those?  Rocks?

7    Is that just --

8            **MR. WARNER:**  So your Honor, if I --

9            **THE COURT:**  -- clear debris?

10           **MR. WARNER:**  If I could show the court, for counsel

11   on the phone, Government Exhibit 3 which was the pictures.

12   What they've done is they've clear cut down and basically made

13   a beach phase feature on what used to be a riverbank that was

14   at least probably three feet in height.  So right there is a

15   beach bleacher now where they have leveled out the riverbank.

16           **THE COURT:**  And it used to be like on the opposite

17   side, sort of just a vertical --

18           **MR. WARNER:**  Correct, your Honor.  And then in terms

19   of --

20           **MR. HU:**  For the court's orientation we can show you

21   where Chimney Park is if that would help.

22           **THE COURT:**  Is there some business in Chimney Park?

23           **MR. HU:**  A trailer park.

24           **THE COURT:**  Oh, there's a trailer park there?  Okay.

25           **MR. HU:**  Right.  There's a trailer park.

1          **THE COURT:**  All right.

2          **MR. WARNER:**  And then in terms of what's actually

3     going on right now, your Honor, I would show the court Exhibit

4     4.  And basically they have dug a trench and they have these

5     big CAT vehicles lined up in front of the trench with mounting

6     posts on them.  And they're bringing in the bollards here on

7     the truck on the right.  And by all appearances it looks like

8     they're ready to drop bollards into the trench that I showed

9     the court in Exhibit 1 that has been set up to hold bollard

10    down.

11         **THE COURT:**  All right.  And distance from the river

12    is approximately what?  From the current shoreline?

13         **MR. WARNER:**  So it looks like it's anywhere from 30

14    to 40 feet, Judge.  So --

15         **THE COURT:**  Now, is that consistent with some of the

16    plans on approved sections of the wall that the government has

17    been undertaking thus far?

18         **MR. WARNER:**  Is consistent with what, your Honor?

19         **THE COURT:**  I mean, obviously there were other large

20    sections of the wall that the government is putting in, the

21    bollard (indisc.) wall.  This distance from the river is it

22    consistent with or inconsistent with what the government has

23    been doing at other similar locations?

24         **MR. WARNER:**  It is inconsistent, your Honor.  As a

25    matter of fact, we closed on the Neuhaus property as a direct

1   purchase to the government so that we could build our wall into

2   the levy on that property.  I apologize.  Right before -- right

3   before We Build the Wall showed up and started clearing.  So we

4   actually agreed to build wall on this piece of property into

5   the levy and they have destroyed the riverbank and are about to

6   put a wall up right next to the river.

7           THE COURT:  And so your wall would be just a bit

8   further back from this wall?

9           MR. WARNER:  No, your Honor.

10          THE COURT:  Or substantially further?

11          MR. WARNER:  If the court would show me the Google

12  map again, Judge?

13          THE COURT:  Sure.

14          MR. WARNER:  So our wall -- this is the levy right

15  here, your Honor (indicating).

16          THE COURT:  Okay.

17          MR. WARNER:  Our wall is going in this.  This is the

18  levy up here (indicating).  So our wall is going in up here

19  (indicating).

20          THE COURT:  And their wall is again, down here

21  (indicating).

22          MR. WARNER:  It's down -- it's right along the

23  river's edge.

24          THE COURT:  Oh, so it's nowhere near --

25          MR. WARNER:  No.

1          **THE COURT:**  All right.

2          **MR. WARNER:**  This right here, Judge, on this far

3     eastern side would be the closest that our wall gets to their

4     piece which is right down here along the river.

5          **THE COURT:**  And that's the levy, I assume?  That

6     structure there, that's the --

7          **MR. WARNER:**  Correct, your Honor.

8          **THE COURT:**  All right.  Okay.

9          **MR. WARNER:**  So the purpose today, your Honor, on

10    behalf of the United States is we have a treaty with Mexico

11    signed in 1970.  It gives the IBWC the power to regulate

12    construction within the floodplain and along the riverbanks of

13    the Rio Grande River.  If one is going to construct, they have

14    a set of requirements in place where you essentially submit

15    your hydraulic modeling to them --

16         **THE COURT:**  Sure, okay.

17         **MR. WARNER:**  And as I understand it, it's a very

18    elaborate packet with things that obviously I don't understand

19    because I went to law school instead of becoming an engineer

20    but they evaluate that.  It takes anywhere -- from speaking

21    with the International Boundary and Water Commission -- it can

22    take upwards of three weeks, maybe a little bit longer if it's

23    really complicated, where they will then analyze and come back

24    to the entity with either a determination that the construction

25    that is being contemplated either doesn't violate the treaty

1  because it doesn't deflect a certain amount of water toward

2  Mexico or it doesn't cause erosion, or they may end up

3  modifying it and saying, listen, if you'll switch it and do

4  something else, then maybe it will qualify.  And they'll send

5  that back to whoever they're dealing with.

6          But the whole point of this, Judge, is the river was

7  constantly changing course.  And so what the treaty was

8  supposed to do in 1970 was set the actual centerline in the

9  boundary in the middle of the river.  And then set up an agency

10  both in Mexico and the United States who would control what

11  happens along that floodplain so that if erosion happened, it

12  was naturally caused; it wouldn't be manmade.  Because if the

13  boundary shifts -- so as what I showed the court in one of the

14  pictures where they've shaved the riverbank, well that may

15  actually move the river now.  And maybe we have less land in

16  the United States as a result, maybe we have more in the United

17  States as a result because they've now shaved that bank without

18  any permission.

19          And so all we're asking is, stop what you're doing,

20  stop it all, stop trenching, stop everything and submit the

21  model like they promised they were going to do in an email on

22  November 21st to the IBWC.  Just stop and let us look at the

23  model.  If it complies, well we're going to tell them we have

24  no objection.  It complies, it doesn't violate the treaty, it

25  means water deflection raise, it's not going to cause erosion,

whatever.  It's not going to shift the boundary.  If it needs

modifications, the IBWC will come back and tell them what

modifications it needs.  On the other hand, if you just can't

build the structure right on the banks of the Rio Grande river,

the IBWC will come back and tell them that as well.  But we

don't know at this point because they submitted a very

bareboned packet.

**THE COURT:**  Yeah, I did see they did provide you some

hydrology information.

**MR. WARNER:**  Very scant.  And then we sent them the

link to the model that is actually the model that the IBWC's

engineers would use to evaluate this.

My understanding is they submitted something this

morning to the IBWC.  We understand it's maybe 12 pages.  We

don't know yet.  I don't, as I stand here before the court, I

don't know if that's going to qualify as the model that the

IBWC needs or if they're still missing information.  But what

we're asking the court for is a restraining order right now

today that tells them to stop, let the IBWC do its job under

the treaty, and come back and either tell them it meets it or

it needs mods or let's just go through the process.

**THE COURT:**  Okay.  Again, it looked like they were

responding to emails.  I mean I saw several different what I

think are sort of hydrology diagrams showing water flow, water

flow in the floodplain, receding water flow, rising water flow,

1  how that would affect.  And then information about the fact

2  that they were actually buttressing the -- reinforcing the bank

3  area so that to prevent erosion.  It'd actually be enhanced

4  riverbank when they finish.  It looks like they were putting in

5  a concrete road or something.  Is that what you were referring

6  to as the scant --

7          **MR. WARNER:**  Yes.

8          **THE COURT:**  Okay.

9          **MR. WARNER:**  So it's six pages of diagrams and a

10  one-page letter dated October 28th, 2019.  A one-page letter

11  that basically kind of guesstimates how what the water flow

12  might be.  And that's -- your Honor, that's not a proper

13  engineering model.

14          The IBWC from there then sent emails with the link to

15  the model so that they could properly input their information

16  into the model for that particular section of the river and

17  then send that back to the IBWC for analysis.  So what got

18  transferred today, this morning after I filed the complaint, is

19  that going to meet it?  I don't know.  The IBWC is looking at

20  it now and will reach back out to let them know -- I guess now

21  through us -- whether it meets the requirements or if they need

22  additional information.  But once they got everything they

23  need, once the IBWC has everything they need, they will begin

24  the engineering analysis to see if this will violate the treaty

25  or not.

1    **THE COURT:**  And this takes you said about five days?

2    **MR. WARNER:**  It's -- they -- when I spoke to the IBWC

3  yesterday, they said two to three weeks unless it's very

4  complicated.  So it is a very complicated engineering process

5  that they go through, your Honor.

6    **THE COURT:**  And so is the gravamen of their complaint

7  what was done with dirt movement on the bank of the river, or

8  is the main complaint with what's being done further back and

9  then placement of bollards?  Or both?

10    **MR. WARNER:**  So the main -- it's actually both now.

11  At this -- we did not realize till this morning that they'd

12  actually started shaving the bank of the river.  Up until this

13  morning, they had been clearing the bank but they had left the

14  bank in place, you know.  But now this morning we see they've

15  shaved the bank, plus dug the trench and are lined up ready to

16  drop bollard.  So it's a compounded problem.

17    **THE COURT:**  But a trench isn't going to affect

18  anything.

19    **MR. WARNER:**  It could.  We don't know.

20    **THE COURT:**  A trench?

21    **MR. WARNER:**  We have not analyzed that.

22    **THE COURT:**  Thirty feet from the river?  I mean,

23  suppose a farmer wanted to put his --

24    **MR. WARNER:**  We don't know, Judge.  They haven't

25  submitted a model.

1          **THE COURT:** A farmer wanted to put in some irrigation

2    equipment to water his fields and so he couldn't bring out his

3    tractor and plow a trench through it without getting -- I mean,

4    30 feet from the river without getting approval from

5    International Waters? That seems a stretch to me.

6          **MR. WARNER:** How about three and a half miles with an

7    18-foot hydraulic fence in it and massive --

8          **THE COURT:** Okay. So farmers got a big piece of

9    property. I mean my example was just -- I mean, in my mind I

10   just don't see that any work being done on a private person's

11   property is something that they need to clear with

12   International Boundary and Water Commission.

13          Now, obviously, shaving the riverbank to me seems

14   that it could affect erosion, it could affect water flow that

15   then may have a deleterious affect on the other side, on the

16   Mexican side of the river. While I can see where you've been

17   enhancing the U.S. side of the riverbank, again, would not --

18   would prevent erosion, natural erosion on the U.S. side and

19   perhaps that would then cause erosion on the -- problems on the

20   Mexican side. And then certainly when you measure the middle

21   of the river maybe it's moved six inches south.

22          **MR. WARNER:** Maybe, maybe considerably, your Honor --

23          **THE COURT:** Or considerably, sure.

24          **MR. WARNER:** Your Honor, and so the other problem

25   with the wall is it's all about water deflection then. So if

1  you put bollards up in a flood event and a high water event

2  that would come up over the river which is now shaved, the

3  bank, that could then deflect water causing erosion in Mexico

4  and further erode the U.S. bank that's now shaved.  So it's a

5  twofold problem; it's not just shaving the bank.  It's

6  deflection off of that concrete structure.

7       I would offer to the court the United States' wall is

8  going in a levy because we're not going to violate the IBWC

9  treaty.

10      **THE COURT:**  Again, the government's not saying though

11 this wall can't be placed there or built there eventually, it's

12 simply that we want to make sure -- the government wants to

13 make sure that it's not going to affect the boundary of the

14 river.

15      **MR. WARNER:**  That is what we're here for today, your

16 Honor, is to say please get them to stop so that we can

17 properly analyze a proper model and do the engineering.  And if

18 it clears, it clears.  We'll have to live with that.  But if it

19 doesn't, then they'll either need to make modifications or

20 think about putting it in a different spot but at least give us

21 a chance to do our job under the 1970 treaty.

22      **THE COURT:**  How much of the river bank has actually

23 been shaved?  The pictures I looked at looked like just a very

24 small portion but is it a rather long area?

25      **MR. WARNER:**  As I stand here, your Honor, I don't

1  know how long --

2          **THE COURT:**  I mean, was it just 30 feet or just --

3          **MR. WARNER:**  More than 30 feet, your Honor.

4          **THE COURT:**  -- make it like a boat ramp?  I mean, or

5  is this a substantial area?

6          **MR. HU:**  Your Honor, I was counting it this morning.

7  It's more than 30 feet.

8          **THE COURT:**  What would you guesstimate?

9          **MR. HU:**  About a mile.

10          **THE COURT:**  A mile of shaving, oh, substantial.

11          **MR. HU:**  (indisc.) about a mile.

12          **THE COURT:**  All right.  All right.  So I do have some

13  questions for counsel for We Build the Wall.  Just following

14  local news, I read on Twitter that the state court had issued

15  an injunction against any sort of construction on this private

16  wall project.  I read a copy of the order which somebody on

17  Twitter had actually posted -- and this was a few days ago.

18  And so then when this lawsuit was filed today, I was a little

19  curious as to what's the purpose of this?  Hasn't construction

20  already been stopped because of the state-court TRO?  And I was

21  advised that here now that obviously that hasn't stopped

22  construction or apparently hasn't stopped.  I don't know the

23  complete details of the -- or don't recall the complete details

24  of the TRO.  But can counsel for We Build the Wall tell me

25  what's happening with that restraining order that was issued in

1  state court?

2      **MR. KOBACH:**  Your Honor, this is Kris Kobach with We

3  Build the Wall.  And I think I'll be handing off in a moment to

4  either Mr. Courtois or Mr. Priebe representing Fisher

5  Industries but just as an initial matter, if just for one

6  minute I might point out a relevant -- a couple of important

7  assumptions in the factual assertion of the complaint that are

8  incorrect.

9      Specifically, paragraphs 13 and 14, there's a

10  mistake.  It's an understandable mistake by the U.S. government

11  but they state that We Build the Wall has contracted with

12  Fisher Industries to undertake this project.  And then

13  paragraph 14 states that We Build the Wall has acquired a legal

14  interest in the land.  Both of those statements are incorrect.

15  We Build the Wall doesn't have any property interest in the

16  land.  And We Build the Wall is not -- did not initiate the

17  project or contract with Fisher Industries.  They might be

18  mistaking this because in a previous project that We Build the

19  Wall built in Sunland Park, Mexico, we did purchase the land

20  and we did contract with Fisher Industries.  But in this

21  particular case, Fisher Industries has bought the land -- or is

22  in the process of buying the land and Fisher Industries is in

23  the driver's seat of the project.  They contacted We Build the

24  Wall to ask us if we could provide any financial assistance.

25  We provided a very modest sum worth approximately five percent

1  of the total cost of the project but we are best equated to a

2  passive investor.  We don't have any control over the project

3  or the machinery or what's going on, nor do we have any control

4  over the property.  So to that extent, we really have no

5  ability to facilitate any relief that the court may grant.  And

6  so therefore we believe we've been improperly named as a

7  defendant and would ask that we be removed.  If the court does

8  issue a TRO, that we be removed from any -- any relief the

9  court grants.  I can understand how they would make the mistake

10 based on our first project and based on some of the social

11 media cheerleading that our -- some of our people have done for

12 this project but we actually don't control anything going on

13 here.

14        We're certainly more than happy to provide the court

15 any information we can but I think most of your questions can

16 be answered by Mr. Priebe and Courtois regarding your question

17 about the state court TRO that was issued two days ago.  It

18 also incorrectly assumes that we are the ones owning and

19 driving this.  It was issued ex parte.  And it, if I recall

20 correctly, I believe it only asks for the cessation of any

21 bollards.  I don't believe it refers -- I could be incorrect

22 but I don't believe it refers to any bank modifications like

23 clearing vegetation.

24        **THE COURT:**  All right.  Now, Mr. Warner, I did see a

25 deed or something.  It looks like this property was conveyed to

1  somebody, or a 150-foot strip three miles long added up to so

2  many hundred acres or something.

3         **MR. WARNER:**  So your Honor, the deed that we attached

4  was so that we could be very specific about property that we

5  were asking for the restraining order on.  So that deed is the

6  deed for that entire peninsula that Mr. Neuhaus bought from the

7  Hardwick (phonetic) family.  And so we wanted to be very

8  specific which -- where we were talking about.  And it

9  basically goes from edge to edge and all the way around the

10 river.  So that's why we attached that for the court for

11 specificity.

12        And your Honor, as to We Build the Wall's

13 involvement, I will be very honest, your Honor.  I watched on

14 their website as Foreman Mike specific said that they bought a

15 150-foot easement and they were clearing 120 feet and saving 30

16 feet in reserve.  So I --

17        **THE COURT:**  Well, he never said who he was with.

18        **MR. WARNER:**  He didn't but he's got big We Build the

19 Wall and he's on their website.

20        **THE COURT:**  No, I didn't -- he had -- I thought he

21 had just kind of a yellowish hardhat.  I didn't notice that it

22 had any -- but he did --

23        **MR. COURTOIS:**  That is correct, your Honor.

24        **THE COURT:**  But at the end he did say we appreciate

25 your contributions and there was some cheerleading as, to use

1  your words, there towards the end but I couldn't tell who he

2  was with.  I assumed he was a construction foreman that was

3  just very enthusiastic about the project.  And also somebody is

4  getting paid.  He's obviously -- I assume he's working.  The

5  more wall there can be built, you know, the better financially

6  he and others who are involved in construction become.  And so

7  I can just see why he would advocate it as well.

8       So all right.  So let's move on then to Fisher

9  Industries.  If I could get counsel for them to clarify, agree

10 or disagree with Mr. Kobach from We Build the Wall about who's

11 really in charge of the construction project.

12       **MR. COURTOIS:**  This is Mark Courtois for Fisher.

13       Yeah, I think that's exactly correct.  One of the

14 Fisher entities is going to be acquiring an interest in the

15 property.  And it's the Fisher entities that are actually

16 undertaking the construction for the work that's been going on

17 out there.

18       Kind of to address the government's position on

19 things, we don't necessarily have a problem working with the

20 commission on trying to get their approval on what we're trying

21 to do.  And we will agree not to pour any cement or build any

22 permanent structure.  But we don't think that there's a need to

23 prevent us from clearing and also trenching in preparation for

24 what should be the construction of the wall.  But in the event

25 that some things needs to change, then that dirt is easily

1  pushed back in and we can move it as necessary.  But this is

2  costing us about $500,000 a day.  We've got about 50 people out

3  there working.  And so it's a major undertaking for Fisher to

4  do this project.  And so we'll continue to work with the

5  government to try to make sure that they're happy and pleased

6  and we can move forward with everything.  But we would like to

7  continue some of the activities out there but we are agreeable

8  not to pour any concrete, place any bollards until such time as

9  we get that approval.

10      **THE COURT:**  And I guess there were some other

11  concerns the government had; in particular, the shaving of the

12  riverbank.  I mean, certainly I think we need to put a

13  temporary stop to that, although maybe you've already finished

14  whatever shaving it was that you were going to be doing.  But

15  it seems to me -- I'm not a hydrology engineer but just seems

16  sort of common sense that the reshaping of the bank in the

17  manner in which it's done, sort of a beach landing I guess how

18  I'd call it now -- could affect water flow and in a way that

19  may be deleterious to either side of the river.  It may be

20  neutral, may be nothing.  Again, I don't understand hydrology

21  and maybe this is zero effect on it and it's just more I guess

22  aesthetically pleasing to have a beach entrance instead of what

23  was there previously.  I'm not really sure why that is being

24  done but in any event, it does -- that does cause the court

25  some concern.

1          Do you have any problems with ceasing the -- that

2   sort of work, the grading of the bank?

3          **MR. COURTOIS:**  Part of the problem we're having is of

4   not getting accurate hydrology analysis unless we do clear the

5   bank.  There was heavy vegetation on the banks.  And you just

6   can't -- you can't get good surveys with that vegetation there

7   and you can't get a good analysis for the hydrology report with

8   that vegetation there.  So for the area that we've been able to

9   do, we actually do better hydrology reports for the government

10  so that they can have that.

11         And the other thing is is that we do want to seed

12  that and we want to get grass growing on it now so it holds.

13  But I mean if you grant this injunction, we're not going to be

14  able to do that.

15         **THE COURT:**  Well, I don't have any problem with you

16  planting grass on it or preventing it from eroding from what

17  you've done from eroding.  I think we would all say that's

18  probably efforts to keep the status quo.

19         **MR. WARNER:**  Your Honor, if I could though I would

20  distinguish from what Mr. Courtois says is clearing which

21  clearly they had done in the past.  They just cleared the

22  bank --

23         **THE COURT:**  Sure, that's --

24         **MR. WARNER:**  -- versus shaving the bank and creating

25  a beachhead which now apparently does need something on it to

1   hold it in place.

2          **THE COURT:** Right so I thought Mr. Courtois was clear

3   about that as well. Nobody's complaining about whatever --

4   moving and bulldozing some trees. Look like maybe there was a

5   lot of stuff that looked kind of to me like sugarcane growing

6   in that area. But plowing that, mowing that down, as long as

7   you're not physically moving dirt from the riverbank or down at

8   the river's edge.

9          So I guess from this point, Mr. Courtois, can we

10  cease the actual shaving of the riverbank until whatever

11  hydrology that needs to be done is completed here in the next

12  week or so.

13         **MR. COURTOIS:** Yeah. I mean, we can do what the

14  court needs us to do. We want to be as cooperative as possible

15  but to move the project forward while we're not -- while we're

16  just sitting here waiting for the agreement.

17         **THE COURT:** Well and obviously you must have a big

18  confidence that your location and design of the fence is going

19  to be okay with the International Boundary and Water Commission

20  given your investment in it. I mean, if it comes out where

21  it's a big problem and then we permanently stopped it, you'd

22  either have to redesign it, put dirt back in trenches and find

23  new places to locate the trench and the wall that you're

24  building. So I would think it would be some incentive for you

25  to stand down as well.

1          All right.  So it seems to me that we have sort of an

2   agreement that we're not going to shave the riverbank.

3          We're not going to install any concrete or bollards,

4   any permanent structures.  But they would like to continue

5   trenching work that's not along the riverbank but the current

6   location.  Does the government have any problem with them --

7          **MR. HU:**  Your Honor, the trenching actually is along

8   the riverbank.  I think if we could show the court Exhibit

9   Number 3 --

10          **THE COURT:**  Hang on.  Let me pull up Exhibit 3.  Or

11  you're talking about your Exhibit 3 for the hearing today or --

12          **MR. HU:**  Yes, Government's Exhibit 3, your Honor.

13          So you can see -- as the court can see in Exhibit

14  Number 3, here's the river (indicating) --

15          **THE COURT:**  Yes.

16          **MR. HU:**  -- and this is probably just a few feet from

17  the river is this dotted line, this kind of pink line and

18  that's where they're doing the trenching at this time.  So it

19  is very close to the river.  And then my understanding is

20  (indisc.) Government Exhibit 1 --

21          **THE COURT:**  But that's not the bollards is it?

22  That's just for the road they're going to build or --

23          **MR. HU:**  It's hard -- it's very hard to tell, your

24  Honor, because obviously --

25          **THE COURT:**  I mean, that's not where the rebar is,

1  that's not where the deep trench is.  I mean, look like there

2  were some other pictures where it looked like the trench was

3  very deep.

4           Mr. Courtois, what's the depth of the main trench?

5           **MR. COURTOIS:**  The trench that we're building for the

6  wall itself is 16 inches wide and about two and -- two feet two

7  inches deep.

8           **THE COURT:**  Oh, that's it?

9           **MR. SPEAKER:**  That seems about right.  That --

10          **THE COURT:**  How do you even put a bollard in

11  something so shallow and then be able to --

12          **MR. COURTOIS:**  Well it is going to come up about a

13  foot over the surface so it's going to be about three feet of

14  concrete altogether and then the bollards are going to

15  (indisc.).

16          **MR. HU:**  Your Honor, I'm showing the court Government

17  Exhibit Number 2.  This is Mexico on the other side of this

18  sort of green and these trucks and where they're doing the

19  trenching work as you can see by this frame is right along the

20  river.  And that is where they're doing, as Counsel stated, the

21  16-inch wide, two foot deep (indisc.).

22          But the concern we've got is they're dropping rebar

23  into it.  So if you're going to put rebar in then it seems to

24  me that (indisc.) the concrete's going to follow it pretty

25  quick.  Because if you leave the trench with the rebar in it,

1  and you have one good rain storm here in the Valley, all you're

2  going to do is have mud.  And so I think you really can't allow

3  trenching and then putting rebar in because then they'll just

4  put concrete in.

5          **MR. COURTOIS:**  Well, I mean, we'll agree to an

6  injunction that there will be no concrete placed until we get

7  this issue resolved.  I mean, the rebar can be easily removed.

8  If we've got electrical conduit, there is going to be

9  electricity going to the wall so the fence.  And so we'd like

10 to be able to get the conduit done, get the rebar in place, get

11 the trench done and not do anything of a permanent nature until

12 we get this issue resolved.

13         **THE COURT:**  I mean, it seems reasonable to me.  What

14 do you think, Mr. Hu?

15         **MR. HU:**  Your Honor, I'm not a construction engineer

16 but it just seems to me if you're going to put rebar in you

17 sort of have to put the concrete in because otherwise the mud

18 will fill it in but I see where Counsel is going with this.

19         **THE COURT:**  I mean, they're willing to risk -- risk

20 that.  Just from what I'm seeing here and what the government

21 is saying, they're -- I mean the government's very pessimistic

22 that this project is going to pass the hydrology analysis or

23 are you really just completely --

24         **MR. HU:**  It's pretty unknown, your Honor.  I mean,

25 for the border fence itself, the fence that the government's

1  building, the IBWC has to approve and get with border patrol

2  and approve all of the border patrol hydrology as well.  And in

3  my experience, when I used to have Mr. Warner's job doing a

4  border fence in '08, we're looking at hundred-page studies,

5  very big complex hydrologic studies and a lot of dialogue

6  between the IBWC and at that time, the border patrol about the

7  hydrology.  So I'm not -- based on my experience, I'm not sure

8  how this is going to go.

9          **MR. KAYE:**  Your Honor --

10         **THE COURT:**  Generally have you --

11         **MR. KAYE:**  Your Honor, this is Richard Kaye.  And I'm

12  the attorney that handled or is currently handling the

13  construction of the border wall in Sunland Park, New Mexico on

14  behalf of We Build the Wall.

15         Our hydrology report, I think we have a couple of

16  items outstanding on that but it was more in the 30-page type

17  thing.  It was not as extensive as counsel for the government

18  seems to --

19         **THE COURT:**  There is no river there, right?  It's

20  just dry land.

21         **MR. KAYE:**  No, it's -- no, yes -- yes, there is.

22         **THE COURT:**  There is?

23         **MR. KAYE:**  You're actually -- actually the gate that

24  we built, your Honor, which is the subject of our negotiations

25  with IBWC, was really up to the river itself.

1          **MR. WARNER:**  Your Honor, I would argue it's maybe a

2   little bit shorter than what we see because it's just a small

3   piece of that wall that's right up next to the river.  The rest

4   of it goes right up the side of a mountain.

5          **THE COURT:**  Okay.

6          **MR. WARNER:**  So there's a piece that comes down.

7      **(Voices overlapping)**

8          **MR. KAYE:**   -- that there's a correction there.

9   Excuse me.

10          We moved over 200,000 cubic feet of dirt.

11          **THE COURT:**  Okay.  I think it --

12          **MR. KAYE:**  So it was a much larger project, yeah.

13          **THE COURT:**  Was there a picture of that on the

14   website?

15          **MR. WARNER:**  There was, your Honor.

16          **THE COURT:**  A before and after?

17          **MR. WARNER:**  Before and after.

18          **THE COURT:**  Okay.  I did see that.

19          **MR. KAYE:**  Yes, yes, yes.

20          **MR. WARNER:**  It's impressive to see, your Honor.

21          **THE COURT:**  It's not my guess.

22          **MR. WARNER:**  I would argue to the court that if

23   you're going to put three and a half miles along the river,

24   that's hydrology all along that three and a half miles, not

25   just the shortest space (indisc.) gate is.  And once again,

1  just don't put any bollard in, quit shaving the bank --

2          **THE COURT:**  Right.

3          **MR. WARNER:**  We'll live with that but let us do our

4  work and come back and let them know whether it passes, whether

5  it needs modifications, what it needs.

6          **THE COURT:**  All right.  Now, how quickly can we get

7  this done?  Three weeks seems like that's sort of a normal "put

8  it in my inbox; I'll get to it but I'm working first-in first-

9  out but can you move this to the top of the line."

10         **MR. HU:**  We're running into holidays.

11         **THE COURT:**  So now you're saying we're going to need

12 a gap for the holidays?  No, that doesn't seem reasonable.

13         **MR. WARNER:**  Your Honor, we were -- so we were going

14 to ask the court for an injunction, a preliminary injunction

15 hearing next week where we were actually going to bring the

16 engineers in to testify to the court.

17         **THE COURT:**  I mean, we can, sure.

18         **MR. WARNER:**  So that we can get these questions

19 specifically answered.  I don't want to speak to the engineers

20 because I just -- I don't understand how complicated

21 engineering is.

22         **THE COURT:**  So Mr. Courtois, can we -- do you think

23 your -- you said you had -- no, I'm sorry.  It was Mr. Warner

24 that said that there had been an uploading of some hydrology

25 information today or this morning.  Is that something that you

1  think will satisfy the water commission's needs or do you

2  foresee that you need to supplement that?  Because some of this

3  is on you as well, your clients, to get that hydrology

4  information to them so that they can then analyze it and

5  determine whether it's satisfactory or not.

6          **MR. COURTOIS:**  This is Mark Courtois.  Yeah, we gave

7  them further evidence today and we're ready and willing to work

8  with them in any way we need to to get them the information

9  they need.

10          **THE COURT:**  All right.  And this is Mr. Greg Jentz

11  (phonetic), the civil engineer who's doing this?  TGR

12  Construction, Inc.?

13          **MR. COURTOIS:**  Yeah, that's Fishery Industry.  He's a

14  Fisher employee.

15          **THE COURT:**  Okay.

16          **MR. KOBACH:**  Your Honor, this is Kris Kobach with We

17  Build the Wall.  Just one point that I think the court should

18  be aware of.

19          The -- I think the three week estimation is certainly

20  possible but based on our experience working with the IBWC,

21  just in getting permission to put a gate across the IBWC

22  property in Sunland Park, we're going on six months.  And the

23  IBWC still hasn't reached a final decision.  So I would

24  encourage you, if you do issue any injunctive relief, that you

25  place some time limit on the IBWC because based on past

1    experience, they have not acted quickly although I think they

2    certainly can.

3            **THE COURT:**  All right.  And --

4            **MR. SMITH:**  Your Honor, John -- if I may?  John Smith

5    for the United States.

6            We also have to remember the IBWC is also doing

7    hydrology with border patrol for this project.  For instance,

8    we just have been in negotiations with Rio Grande City where we

9    are doing multiple hydrology studies to determine the alignment

10   there.  So I mean there's other projects with border wall

11   concerns for hydrology reports ongoing.  So I don't want to

12   speak for them on how quick they can do that.

13           **THE COURT:**  No with --

14           **MR. SPEAKER:**  But this is on private property though.

15           **THE COURT:**  Right.  The others aren't -- real no

16   urgency on the others.  But doesn't this seem to be -- I mean,

17   this seems to be duplicative of what the government is already

18   doing.  What is -- I just wonder what's the science behind why

19   this particular private wall is being placed here when just a

20   few thousand feet away is the government's going to put up

21   their bollard designed wall.

22           **MR. WARNER:**  So ours would actually be that levy

23   wall, your Honor, that's actually built into the levy --

24           **THE COURT:**  Right.  I'm familiar with them.

25           **MR. WARNER:**  Right.  So we've already started that in

1 Hidalgo County because of hydrology issues.  We don't want a

2 Swiss-cheese fence where maybe sometimes it's okay along the

3 river and then sometimes it's not.  So in order to maintain

4 consistency, we've gone to the levy.  It's a known item.  And

5 we're building our wall there.  As a matter of fact we --

6          **THE COURT:**  Yeah.  My question wasn't to you.

7          **MR. WARNER:**  Oh, okay.

8          **THE COURT:**  I understand why the government's putting

9 its wall in.  I'm wondering why is the private party here

10 spending its resources putting in a wall that's going to run

11 parallel and adjacent to a government-funded wall.  It just --

12 I'm curious as to the science behind that.

13          **MR. PRIEBE:**  Your Honor?

14          **THE COURT:**  Yes?

15          **MR. PRIEBE:**  Your Honor, this is Tim Priebe.  I'm

16 general counsel for Fisher and I think I can address that

17 issue.

18          You know, we followed and we've been pretty active in

19 pursuing border wall contracts to find a solution for that.

20 And we understand from everybody we've talked to at DHS, the

21 other entities and so forth, that they're struggling in Texas

22 acquiring private right of way and so forth.  And a lot of

23 people we've talked to in Texas don't like the government

24 putting the wall two feet off the border.  So part of this --

25 and you're right, we're investing a ton of private money to try

1  to work with IBWC to come with a solution that puts the wall

2  right along the Rio Grande where it's going to be best for

3  border protection.  So all along we've tried to advise IBWC

4  with what we're doing, why were doing it and so forth.  But to

5  answer your question I think is, from all the input we've got

6  from DC from DHS from everybody, the solution that currently

7  the core is working on to put it two miles off the border just

8  isn't working.  And we are confident in our hydrology studies

9  that the IBWC at the end of the day is going to agree with us.

10  So as Mr. Courtois had alluded to, you know, if we're wrong and

11  we're investing our own money, we need to fix it then and we

12  need to take whatever wall is out, we need to do whatever

13  grading they need and so forth.  And, you know, my experience

14  in TROs and so forth, you can bond some of these things too.  I

15  don't know if it's appropriate with something like this.  But

16  we want to work with IBWC, we're willing to give them whatever

17  assurances, give them as much information as they (indisc.) to

18  get this done.

19          **THE COURT:**  Let me just make a couple of comments.

20  And one, I do want to talk about bonding but I think your

21  premise is mistaken about landowners not wanting the wall or

22  preventing the government putting a wall there.  If you could

23  tell me how many landowners in Hidalgo and Starr County that

24  you approached to get rights of entry on.  There were like 267

25  landowners and we think we had three that didn't grant the

1   government's request to do that.  Two of them were a church,

2   one was a city park that was a church many years ago but owned

3   by the city now.  One was the property that was the home for

4   some priests and then the third was just somebody they couldn't

5   get ahold of who had fled to Mexico to dodge, allegedly dodge

6   law enforcement troubles.

7         **MR. WARNER:**  So judge we've actually -- we filed

8   almost 30 rights of entry condemnations.  Some of them have

9   settled very quickly once we filed.  Judge Alvarez had a whole

10  slew of them as well.

11        **THE COURT:**  I thought Mr. Smith or somebody had come

12  here and told me that there were hundreds and hundreds that had

13  been filed and only three that were contested --

14        **MR. WARNER:**  So (indisc.) the project, if we go all

15  the way to Starr County, yes, we're talking hundreds and

16  hundreds.  And even those have mostly agreed, your Honor.  We

17  may have more coming.  I can tell the court --

18        **THE COURT:**  It hasn't been this -- so the premise

19  that there's this big opposition is simply a false premise or

20  maybe that's something that's -- you're reading too much in the

21  social media.

22        **MR. WARNER:**  We have landowners agreeing now for fee

23  takes, your Honor, not just rights of entry.  And we are also

24  going to start filing shortly some declarations and (indisc.)

25  fee but --

1          **THE COURT:**  And many of the cities like the City of

2   Roma and County of Hidalgo, for example, actually welcomed this

3   as an improvement to the levy system that's desperately needed

4   to prevent flooding in those counties.  And so I just wanted to

5   make sure you're not operating under a false assumption.

6          So let me now let's talk about bonding.

7          So yeah, I guess we could come up with a bond where

8   you could bond around what the government would like to

9   prevent.  I guess if you want we could figure out what it would

10  cost to remove concrete and rebar.  I would think that would be

11  something that would be a rather large expense.  Bonding

12  (indisc.) probably isn't the best way to go, given that I think

13  we can get this all resolved in the next few weeks.

14         **MR. WARNER:**  Judge, we will certainly let IBWC know

15  right after this hearing that the court has asked them to put

16  this to the top and get this done in a timely manner.  I just

17  don't know how long that is.  When I spoke to one of the

18  engineers yesterday, they indicated two to three weeks

19  depending on complexity.  So I just don't know the complexity

20  here.

21         **THE COURT:**  All right.  And we don't know I guess

22  what was uploaded today.

23         **MR. WARNER:**  I know it was 12 pages is what the IBWC

24  informed me.

25         **THE COURT:**  All right.  But that 12 pages may be very

 1  helpful.  There were maybe four -- six pages previously that

 2  were not as helpful, I think, as the government expected.  And

 3  so perhaps this is elaborating on that.

 4       MR. WARNER:  Well hopefully it's the analysis that's

 5  needed for IBWC, your Honor.  But with the court's permission,

 6  we'll -- if it's not, we'll let Fisher Industries know what we

 7  need in order to complete the analysis.

 8       THE COURT:  So this analysis where they talk about

 9  let's see, depth of innodated -- inundation for (indisc.)

10  floodplain ranges from three feet to 15 feet, average depth

11  seven feet; therefore, depth of water and bollard during an

12  event would also be seven feet.  They talk about 263 cubic --

13  sorry 263 million cubic feet of water that can pass through

14  these.  They talk about the effect of the bollards and how

15  basically their bollards run parallel to the river.  I mean,

16  that's not the analysis.  You need something in more depth than

17  that.

18       MR. WARNER:  (indisc.) just take the river flow and

19  plug that into your project and then show that is in just a

20  very rudimentary explanation as to what I was trying to --

21       THE COURT:  Okay.  So here they talk about average

22  velocity of flood water is about point three feet per second.

23       MR. WARNER:  And maybe -- maybe today, what they

24  submitted today, maybe that does and we can begin analysis,

25  your Honor.

1          **THE COURT:**  All right.  So then let's do this.

2          I'm going to enter an order stopping any grading or

3   shaving of the riverbank, and also enjoining any permanent

4   structure like the placement of concrete.  And what else?

5          **MR. WARNER:**  Bollards.

6          **THE COURT:**  Bollards.  Well, you can't put the

7   bollards without the concrete.  I'll permit -- well it's

8   already been trenched.  If the parties want to lay conduit in

9   there and lay -- what's already been trenched if they want to

10  put rebar in there and conduit, they're welcome to do that.

11         What else do I want to stop?  We want no concrete

12  poured.  We want no shaving of the riverbank.

13         **MR. WARNER:**  And no bollard wall being constructed.

14         **THE COURT:**  Yeah, and well, in general, no bollard

15  wall being constructed but that's can't happen without

16  concrete.

17         Mr. Hu, anything you want to add?

18         **MR. HU:**  Just no bollard wall or any other kind of

19  obstructive wall.  (indisc.) to say sheet metal or something

20  else.  We don't want any sort of wall built that could deflect

21  water.

22         **THE COURT:**  All right.  Mr. --

23         **MR. WARNER:**  Until the analysis.

24         **THE COURT:**  Mr. Courtois, any problems with that?

25         **MR. COURTOIS:**  No, we're not planning to build any

1  wall.  The things that we want to be able to do are clear and

2  grub and to seed, trench, lay conduit and rebar.

3          **THE COURT:**  All right.  So I'll allow you to seed.

4  Again, we just don't want to do anything at the river's edge

5  that's dirt movement, you know, no shaving, no anything that

6  affects the riverbank.

7          **MR. COURTOIS:**  Okay.

8          **THE COURT:**  But seeding what you've already done is

9  reasonable and probably a good idea so that there's no erosion

10  of what's already done.  And then again, no concrete pouring,

11  no actual construction of the wall till we can get this

12  hydrology in.  And then I'll also require the government to

13  give this hydrology analysis high priority and just urge the

14  engineer there with Fisher to coordinate.  I mean, this seems

15  like it's going to require expeditious work on both sides as

16  I'm sure the boundary is going to ask for additional

17  information.

18          So shall we have a status conference in a week to see

19  where we are and to make sure everybody's doing what they need

20  to be doing?

21          **MR. WARNER:**  We would request that, your Honor.

22          **MR. COURTOIS:**  We would like that from Fisher's point

23  of view.

24          **THE COURT:**  All right.  So --

25          **MR. KOBACH:**  And your Honor, this is Kris Kobach

1    again for We Build the Wall.  Will the court then be dismissing

2    us from this action or?

3         **THE COURT:**  Do they need to be part of it?

4         **MR. WARNER:**  Your Honor, if all they're supplying is

5    money and they're not in control of the earth-moving equipment,

6    then I guess that they're not doing anything active out there

7    that we're trying to enjoin.

8         **THE COURT:**  Mr. Courtois, do you have any

9    disagreement of Mr. Kobach's analysis of We Build the Wall's

10   involvement?

11        **MR. COURTOIS:**  No, honestly, we'd like to get rid of

12   them, Judge.  In a nice way.

13        **(Laughter)**

14        **THE COURT:**  All right.  Well, all right.  Well then

15   it sounds like they don't need to be involved anymore.  And so

16   despite their catch name, we'll get rid of them so it'll just

17   be a Fisher Industries' defendants here.

18        So I'm going to ask the government to draft the

19   proposed order so that they include what I've stated and no

20   more.  And then send it to the court and copy opposing counsel.

21   And then I'll get that entered today, shortly.  If there's any

22   objections, I would ask that somebody -- that you-all call and

23   communicate that to the government, I guess, who has formally

24   appeared.  And if you-all can't work it out, then we'll just

25   get you-all back on the phone again.

1          **MR. WARNER:**  Judge, do we email that to the case

2    manager?  The proposed order --

3          **THE COURT:**  Yeah, to Ms. Rodriguez.

4          **MR. WARNER:**  --after we've agreed?

5          **THE COURT:**  Yeah.

6          **MR. WARNER:**  Okay, will do.

7          **MR. SMITH:**  Your Honor, John Smith, if I may?

8          **THE COURT:**  Sure.

9          **MR. SMITH:**  It sounds to me as though they haven't

10   acquired the property from Mr. Neuhaus.  So I think we have to

11   keep the Neuhaus properties in because they are still the

12   landowner.

13         And then I'm also going to point out to the court and

14   maybe to the Fisher Industries groups, the actual bank is owned

15   by the IBWC and not by Mr. Neuhaus.  So that's why shaving of

16   that bank is also a problem.  IBWC acquired the bank from the

17   State of Texas back --

18         **THE COURT:**  And so what is -- I know like at the

19   beach it's the mete and vegetation.  How do you measure what --

20   how much of the bank the boundary actually owns

21         **MR. WARNER:**  So IBWC said that they owned the

22   vertical portion.  Once it became horizontal it became the

23   landowners' again.  And so shaving it is shaved essentially

24   where IBWC owns it.

25         **THE COURT:**  The vertical portion or it's maybe now

1  diagonal.  And so now they own all the way up --

2        **MR. WARNER:**  Almost horizontal now, yes.

3        **THE COURT:**  Yes, okay.  All right.  So if you'll just

4  prepare an order that memorializes what the court has stated

5  and been agreed to by the parties and I'll get that entered as

6  quickly as you can get it to me.

7        **MR. WARNER:**  Your Honor, we will draft it and share

8  that with Mr. Courtois.  And then once we have an agreement,

9  we'll submit that to the case manager.  Your Honor, if we have

10  a disagreement, we can just let the case manager have two

11  versions and let the court choose?

12        **THE COURT:**  You could do that or and then if I have

13  any problems deciding if then I can get you-all on the phone

14  again.

15        **MR. WARNER:**  Very well, your Honor.

16        **MR. COURTOIS:**  That's fine, Judge.

17        **THE COURT:**  All right.  And Mr. Olivera, did you want

18  to say anything?

19        **MR. OLIVERA:**  Now -- your Honor, I got in this case

20  less than 24 hours ago so I find it very interesting but I have

21  nothing to add.

22        **THE COURT:**  All right.  Well then I'll set this then

23  formally for hearing next week.  What works best for out-of-

24  town counsel?  I mean, I can do this by phone again.

25        What is today?  Thursday?  Let me just look next week

1  at my calendar quickly here.

2      **(Pause)**

3          I guess any early afternoon.  My mornings are all

4  pretty full with criminal matters.

5          **MR. WARNER:**  Does Thursday work your Honor?

6          **THE COURT:**  Yeah, Thursday works.  We can do Thursday

7  at 1:30 again.  That's Central time.

8          **MR. WARNER:**  Your Honor, if there is an issue with

9  the hydrology that the government believes the court needs to

10  understand further, would the court entertain a witness from

11  IBWC to explain to the court?

12          **THE COURT:**  Sure.  You can bring whomever you'd like

13  or you can submit whatever you like.

14          **MR. WARNER:**  And I'm hoping there is not a problem

15  but just in case.

16          **THE COURT:**  Sure.

17          **MR. WARNER:**  Okay.

18          **THE COURT:**  All right.  Anybody else have anything

19  they want to add?  Mr. Hu,

20          **MR. HU:**  One thing, your Honor.  For hearing next

21  Thursday, can I call in from Houston?

22          **THE COURT:**  Sure, you may.  I mean, I like some warm

23  bodies here.

24          **MR. WARNER:**  I will be here.

25          **THE COURT:**  Mr. Warner, maybe local counsel, Mr.

1  Olivera can be here next week as well.

2            **MR. OLIVERA:**  I'll be here.

3            **THE COURT:**  And especially if there's a witness you

4  want to bring, giving some an opportunity to cross examine

5  them.  And again, if you give us some little advance warning,

6  we can probably Skype some people in as well.

7            All right.  Then I'm going to recess and wait to get

8  the proposed order from you, Mr. Warner.

9            **MR. WARNER:**  Correct, your Honor.

10            **THE COURT:**  All right.  We'll be in chambers all

11  afternoon so as soon as it comes in, we'll get it entered.

12            **MR. WARNER:**  Thank you, your Honor.

13            **THE COURT:**  All right.  We'll be in recess.

14       **(Attorneys thank the court)**

15            **THE MARSHAL:**  All rise.

16       **(Proceeding adjourned at 2:42 p.m.)**

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          __December 9, 2019__
            Signed                              Dated


                    *TONI HUDSON, TRANSCRIBER*