1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                  MCALLEN DIVISION

4   UNITED STATES OF AMERICA      §     CASE NO. 7:19-CV-403
                                  §     MCALLEN, TEXAS
5   VERSUS                        §     THURSDAY,
                                  §     DECEMBER 12, 2019
6   FISHER INDUSTRIES, ET AL      §     1:38 P.M. TO 2:14 P.M.

7

                        STATUS CONFERENCE
8
               BEFORE THE HONORABLE RANDY CRANE
9                 UNITED STATES DISTRICT JUDGE

10

11

12      APPEARANCES:                    SEE NEXT PAGE

13      ELECTRONIC RECORDING OFFICER: RICARDO RODRIGUEZ

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 ELDRIDGE ROAD, #144
22                SUGAR LAND, TEXAS 77478
                   Tel: 281-277-5325
23              www.judicialtranscribers.com

24
    Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

1                        <u>APPEARANCES:</u>

2

3   FOR PLAINTIFF,
    THE UNITED STATES OF AMERICA: US ATTORNEY'S OFFICE
4                                Eric Paxton Warner, Esq.
                                 1701 W. Bus. Hwy. 83
5                                Suite 600
                                 McAllen, TX  78501
6                                956-618-8010

7                                US ATTORNEY'S OFFICE
                                 Daniel D. Hu, Esq.
8                                Chris Smith, Esq.
                                 1000 Louisiana, Ste. 2300
9                                Houston, TX  77002
                                 713-567-9518
10

11
    FOR FISHER INDUSTRIES:
12                               Ernest Fielder, Esq.

13
    FOR NEUHAUS AND SONS, LLC:
14                               Lance Kirby, Esq.

15

16

17

18

19

20

21

22

23

24

25

1     McALLEN, TEXAS; THURSDAY, DECEMBER 12, 2019; 1:38 P.M.

2          THE COURT:  All right.  As my computer is logging

3     on, I'll go ahead and call the case:  United States of

4     America versus Fisher Industries, et al, Civil Action

5     No. 19-CV-403.

6          Announcements for the Government first?

7          MR. WARNER:  Good afternoon, Your Honor.  Paxton

8     Warner, John Smith, and Daniel Hu, on behalf of the United

9     States of America.

10         THE COURT:  All right.  And then representing

11    Fisher Industries and the Fisher Defendants also?

12         MR. FIELDER:  Ernest Fielder on behalf of Fisher

13    Industries.

14         THE COURT:  All right.

15         MR. KIRBY:  Your Honor, Lance Kirby on behalf of

16    Neuhaus and Sons.

17         THE COURT:  All right.  Thank you-all for being

18    here this morning -- or this afternoon, excuse me.

19         So this was a -- the purpose of this was sort of a

20    status conference to see where we are.  There was -- seemed

21    to be some urgency on behalf of the Fisher Defendants to get

22    this hydrology information to the Government approved,

23    disapproved, modified so that they can could then get the

24    okay by the boundary commission to proceed with some form of

25    their project as planned or as modified.

1        The morning of the last hearing, my recollection

2 was that there was some 12-page hydrology analysis that was

3 submitted.  We were unsure about all that or how that would

4 play out.

5        MR. WARNER:  So it was --

6        THE COURT:  So tell me where we are, Mr. Warner.

7        MR. WARNER:  Yes, Your Honor.  It was -- it did

8 not contain the two dimensional modeling that is required

9 and it was still lacking in terms of the theory or the

10 method that needs to be used.

11        So IBWC sent a very detailed list to Mr. -- and I

12 don't want to mis-pronounce, Mr. Gempsh (phonetic), I think

13 is his name, letting him know what was short on that today.

14 We got those 12 pages back and a couple of things have been

15 cleared up and then they filled in where they're going to

16 add the modeling.

17        THE COURT:  Okay.

18        MR. WARNER:  So there's some -- there is something

19 called "LIDAR" that really tracks the terrain of the

20 floodplain that needs to be used and so --

21        THE COURT:  That's a software program?  What is

22 Lidar?

23        MR. WARNER:  LIDAR has -- if you know --

24        MR. FIELDER:  It's a radar based system.

25        THE COURT:  Okay.

1          MR. FIELDER:  Often used with respect to weather.

2          THE COURT:  Sure.

3          MR. FIELDER:  That will provide elevations and

4    contours within a two or three dimensional space.

5          THE COURT:  Okay.

6          MR. WARNER:  So part of what has to be shown for

7    the IBWC to plug into its modeling system is cross-sections

8    every so often that includes the bank, all the way down to

9    the middle of the river, and then up along the floodplains.

10   There's really no way to get Mexico's, but what we've told

11   them is we'll just concentrate on the US and the US side and

12   that'll be fine.

13         So my understanding from our meeting that we had

14   yesterday and based on what they sent to us today is that

15   they are trying to get the LIDAR modeling.  We are also

16   trying to get a form of that.  We understand the FEMA may

17   have the LIDAR modeling for that area, and so we're checking

18   with FEMA.  It's a different agency.

19         So, but we're asking if we can share that.  If we

20   can, that will speed it up.  If not, then they need to get

21   the LIDAR modeling.  They've done the river bank.

22         THE COURT:  Okay.

23         MR. WARNER:  Because I understand -- as I

24   understand it's now you do the floodplain and then they have

25   to show in a flood event that these different cross-sections

1  without their project and then with their project what the

2  deflection rates should be.  So we're probably still a

3  couple of weeks away.

4          THE COURT:  Do you want to add anything to that or

5  correct anything that was said, or is that accurate?

6          MR. FIELDER:  I was not at the meeting yesterday,

7  but nonetheless we've attempted to be completely transparent

8  with the Government.  We invited them to the site.  They

9  walked the site.  I gave them two hours.  This was not two

10  hours of attorneys arguing about the shape of the table or

11  who sits where, we were not even present.  We allowed them

12  to ask any questions they wanted of our clients, look at any

13  documents we had, open book policy.

14          With respect to the LIDAR, we would suggest the US

15  Government already has that information.  They've had that

16  information, had it for years in association with creating

17  what is essentially a reservoir down there, flood control

18  gates, spillways -- they have all that information.

19          THE COURT:  Okay.

20          MR. FIELDER:  And thus, we see this insisting that

21  we now do it as potentially delaying this and this is

22  something that should not be delayed because we think at the

23  end of the day this is not a close call.

24          THE COURT:  Sure.

25          MR. FIELDER:  We think at the end of the day this

1   is -- not only does it not adversely impact surrounding

2   properties or Mexico, it ameliorates flooding in the area.

3             THE COURT:  Uh-huh.

4             MR. FIELDER:  It makes it better, not worse, and

5   thus we see this as to a certain extent some more delays by

6   the Government, but nonetheless, we're doing what we can to

7   cooperate.

8             THE COURT:  So how do we ensure that this -- the

9   FEMA, the Government already has this information and FEMA

10  gets it over to your agency, whoever needs it over here,

11  what --

12            MR. WARNER:  We've asked --

13            THE COURT:  I mean, how do you expect the

14  private --

15            MR. WARNER:  -- it's the software of FEMA, so

16  everybody --

17            THE COURT:  -- the private citizen to have greater

18  access to something that's held by the Government than

19  another Government arm?

20            MR. WARNER:  We're hopeful.  I mean, unless --

21            THE COURT:  Right.

22            MR. WARNER:  -- the Court's going to issue an

23  Order.  We're doing the best we can to follow the protocols

24  that we have with FEMA to get it.  Just because FEMA has it,

25  doesn't mean IBWC has it.

1           THE COURT:  Sure.

2           MR. WARNER:  And so IBWC in any project that is

3    proposed in the floodplain asks the party that's doing the

4    project, get the -- we need LIDAR results --

5           THE COURT:  Okay.

6           MR. WARNER:  -- that we can then plug into our

7    model with the cross-sections, and so we haven't asked

8    anything else of Fisher than we've asked of anyone else.

9           THE COURT:  Well who else is doing this?  I mean.

10          MR. WARNER:  Who else is building 3-1/2 miles of

11   fencing?  But Your Honor, we are going above and beyond.  We

12   would not normally do this for a party, but when we found

13   out that FEMA does have LIDAR of the area, we've reached out

14   to them to see if they will share that with us so that we

15   can share it with Fisher and maybe speed this process up.

16          So we're trying.  The Government is not delaying

17   on this.

18          THE COURT:  Were you inviting a Court Order to

19   that effect?  I mean, you suggested, well, maybe if we got a

20   Court Order FEMA could get it to us.

21          MR. WARNER:  Judge, if FEMA says no, we're stuck.

22   That's all I'm saying.  And they haven't said yes or no.

23          THE COURT:  I know they're a separate party.  I

24   mean, the United States of America is the party here.  It's

25   not like their the separate -- like the postal service is

1 kind of independent, but FEMA would --

2       MR. WARNER:  I just wanted the Court to

3 appreciate, we can ask, but we can't force if FEMA says no,

4 that would violate our protocols -- FEMA's protocols.

5       THE COURT:  So how do we get past that?  It seems

6 that if FEMA is unwilling to give it to you, that they're

7 going to be unwilling to give it to a private developer.

8       MR. WARNER:  They may not be.  We've reached out

9 to them.  That was one of the things that we discussed on

10 the river bank yesterday was that we would try to obtain

11 that for them, but if we can't, then we need to do a LIDAR

12 study, which will probably take a couple of weeks.

13       THE COURT:  So you're -- the alternative if FEMA

14 for some reason can't give it or let's even think of a

15 hypothetical where it's destroyed, doesn't exist or

16 something, a private citizen can then hire someone to

17 perform this LIDAR analysis?

18       MR. WARNER:  Correct, Your Honor.

19       Correct.  It's expensive, but so they knew that,

20 though, Your Honor.  They actually went and met with the

21 Commissioner a couple of months ago.  They knew that they

22 needed modeling.  They knew -- they met with them at that

23 time, told them what to present, how to present it, and

24 instead they went forward, and so --

25       THE COURT:  But also, you know, I guess I've

1  always been kind of mind that you know, you don't make

2  somebody jump through a hoop just to make them jump through

3  the hoop, so if you already have it, so --

4            MR. WARNER:  Your Honor --

5            THE COURT:  -- so we have it, but you're going to

6  have to go do it yourself.  That seems petty.

7            MR. WARNER:  The IBWC does not have it yet.  The

8  IBWC found out about it, asked if FEMA could share it with

9  them, because it is a pretty big deal that FEMA has gone out

10 and done this.

11           THE COURT:  Uh-huh.

12           MR. WARNER:  I mean, to my knowledge, they haven't

13 done that, if ever -- if ever?  We don't know, but --

14           THE COURT:  Can you do a FOIA request and get it

15 anyway?  I mean, it's --

16           MR. WARNER:  Well, I'm hopeful we're going to get

17 it Judge, --

18           THE COURT:  I mean, --

19           MR. WARNER:  -- but regardless --

20           THE COURT:  -- probably some of these reporters

21 could get it just for Freedom of Information Act request.

22           MR. WARNER:  The point is -- the point is, Judge,

23 they need to do that --

24           THE COURT:  Sure, okay, but you --

25           MR. WARNER:  -- before --

1  THE COURT: -- everybody knows that. So how do we

2  get it done?

3  MR. WARNER: -- before they move forward and so to

4  that end, I've got a couple of very short videos I would

5  like to show the Court. One is three minutes, and the other

6  is maybe about 35-40 seconds.

7  We just have some concerns, Your Honor, about

8  what's going on at the site. While we're waiting for the

9  modeling to come in so that we can then run our systems.

10  The IBWC has committed to us that they will

11  elevate this to the highest on the list, so as soon as they

12  get the modeling in from Fisher, Fisher goes to the top of

13  the list and they will work on that right away to analyze it

14  and get either a no objection letter or a modification

15  letter, if it's required, or if it's just not going to work,

16  then it'll be an objection letter.

17  THE COURT: So -- okay, so they need a LIDAR

18  study?

19  MR. FIELDER: Yes.

20  THE COURT: Okay. So that -- in addition to the

21  LIDAR study what else then is needed? I guess just some

22  analysis that coordinates with that LIDAR study?

23  MR. WARNER: And then as I understand it, Your

24  Honor, and I have -- we call him Dr. Mooney, just because

25  it's easier to say that, than his full name, Your Honor, but

1  we have him here if the Court wants testimony.  I mean, I

2  think we can just explain to the Court once you get this

3  LIDAR, you plug that into the model with the cross-sections.

4  You show the cross-sections at the flood -- the flood rate,

5  the cubic feet per second that they've got in the model.

6         You show what that normally would be, then you

7  plug your project into that with those different cross-

8  sections showing all the way up to the levee and then you

9  show what the flood rate would be with your project.

10        THE COURT:  Sure.

11        MR. WARNER:  And then the IBWC will take that --

12  and that was a very, very simplistic explanation, Your

13  Honor, but the IBWC will then take that, analyze it, look at

14  deflection rates, and see if that meets the standards under

15  the Treaty.

16        THE COURT:  All right.  So and I guess Fisher is

17  sort of ready to do that once they get this LIDAR study, or

18  no?

19        MR. FIELDER:  We submitted what we believe to be

20  an appropriate hydraulic study of the system.  We believe

21  that the Government knew months ago that this LIDAR study

22  was available, would be needed.

23        And this study consists of data points.  FEMA

24  conceivably could email that to the Government today.  They

25  could run it through their model and we could be done

1  tomorrow morning.

2        MR. WARNER:  No.

3        MR. FIELDER:  And --

4        MR. WARNER:  We could send it to them, they could

5  then do the modeling and send it back to the Government for

6  our analysis.

7        THE COURT:  Is it that quick?  The modeling that

8  quick?

9     (Many voices at the same time.)

10        THE COURT:  One at a time.

11     (Many voices at the same time.)

12        THE COURT:  Okay.  So.

13        MR. FIELDER:  I apologize for the hyperbole.

14        THE COURT:  Sure.

15        MR. FIELDER:  We're all running the same basic

16  models, we're all running the same basic program.  What's

17  lacking essentially -- a nail sketch is this LIDAR data.

18        THE COURT:  Okay.

19        MR. FIELDER:  Plug in and this thing -- you know,

20  the -- when I run the model and they run the model, you use

21  the same assumptions, the result is the same every time and

22  it's repeatable.

23        So we're suggesting it's economic waste for us to

24  spend tens and tens of thousands of dollars to produce data

25  that is already in FEMA's hands.

1        This is easy.  I would suggest that the Court

2  could potentially --

3        THE COURT:  I would tend to agree with you on

4  this.

5        MR. FIELDER:  -- order FEMA to simply release that

6  data so we could move forward.  48 hours, 72, four days,

7  doesn't matter, but it certainly is a much better outcome

8  than wasting weeks and weeks and weeks trying to find a

9  service provider, try to get them up-to-speed, and paying

10 all that money.  Because I guess the backdrop -- understand,

11 we've got 70 guys out there at a construction site that's

12 been shut down.  We've got tens of --

13       MR. WARNER:  It's not shut down, Judge.

14       MR. FIELDER:  -- we've got --

15       THE COURT:  So, but look.  I mean, we would say --

16 I mean, I would say, look, as part of Rule 26 disclosures,

17 you've got to give them that LIDAR study anyway.

18       MR. WARNER:  If we have it.

19       THE COURT:  Well, the United States of America is

20 the party here.  It has it.

21       MR. WARNER:  I understand that.

22       THE COURT:  You're telling me FEMA has it.  That

23 is the United States of America.

24       MR. WARNER:  Okay.

25       THE COURT:  Isn't it?

1          MR. WARNER:  It is.  It is.

2          THE COURT:  So you have it.

3          MR. WARNER:  But every agency is different, Judge,

4   and they don't all share the same information.

5          THE COURT:  I understand, but it is the -- you are

6   the party here.

7          MR. WARNER:  I understand.

8          THE COURT:  It's required to be -- I mean, again,

9   this is something a Rule 26(a) disclosure you need to give

10  up and so you mentioned that you made a request.

11         MR. WARNER:  We have.

12         THE COURT:  When was that?  What's been the

13  response?

14         MR. WARNER:  It was my understanding that we made

15  the request yesterday.  They were looking into that today.

16  We were trying to get an answer by court time, we didn't get

17  the answer.  So we're --

18         THE COURT:  Are you dealing with an agency

19  representative or in-house counsel for the agency, or how

20  does that even work?

21         MR. WARNER:  So our agency people know someone in

22  their agency and they're working it, Judge.

23         THE COURT:  So your agency -- the US Attorney's

24  Office or the --

25         MR. WARNER:  No, the IBWC.

1          THE COURT:  The IBWC, okay, okay.

2          MR. WARNER:  Yes.

3          THE COURT:  And -- all right, and I assume they

4  probably work together.  I mean, this is a pretty common

5  thing that they work together, and so you expect to hear

6  back soon?

7          MR. WARNER:  We wanted to hear back today, Your

8  Honor.

9          THE COURT:  All right.  Mr. Hu, did you want to --

10          MR. HU:  Your Honor, may I just tell one thing on

11  the LIDAR study?

12          THE COURT:  Sure.

13          MR. HU:  My clients advise me that this is not --

14  it's about $2,000 a square mile.  It's not hideously

15  expensive.  In the context of what they say is a $40 million

16  project, $2,000 a square mile for this analysis is not a lot

17  of money in that context, first.

18          And second, my understanding that this doesn't

19  take a long time.  They may be able to get it done in, what,

20  a day and a half or so?

21          THE COURT:  Well, you have to get somebody to do

22  it, but you already have it.  You're required to provide.

23          MR. WARNER:  We understand, Your Honor.

24          THE COURT:  I mean, it seems like -- again, your

25  role here is just to make sure that somebody building in a

1   floodplain is doing so in compliance with the law.  You

2   don't really -- you're not an advocate for one position or

3   another position.

4           If you have this information, it needs to be just

5   shared.  I mean, we require it under our Rules.  And so I'll

6   ask that you find out as soon as possible and report back to

7   the Court, maybe tomorrow?

8           MR. WARNER:  Okay.

9           THE COURT:  And if you get resistance from FEMA,

10  then I feel like an appropriate Court Order against the

11  Government would be helpful.  I mean, --

12          MR. WARNER:  Well, we will make a note of it.

13          THE COURT:  -- maybe you can explain to them that

14  the Rules of Civil Procedure require the disclosure of this

15  kind of information by the Government.  You can't use it as

16  a sword and a shield, and so it needs to be produced.  If

17  you're going to pursue this suit and you have this

18  information, I feel like in fairness it needs to be given up

19  and I believe required by our Rules.

20          All right.  So what -- okay, so where else are we?

21  I mean, this is --

22          MR. WARNER:  So Your Honor, we're taking issue

23  with some of the things that are going on at the

24  construction site, and I have two short videos that I would

25  like to show the Court.

1      THE COURT:  Did you file a Motion for Contempt,

2  or?

3      MR. WARNER:  I did not, Your Honor.

4      THE COURT:  Well, how do you -- so are we prepared

5  to respond to this?  I mean, I'm happy to look at it, but I

6  feel like the appropriate, if you're not happy with what's

7  happening there, if you believe there's been a violation of

8  the Court's Restraining Order, then file appropriate motion.

9  I'll set it for immediate hearing, and we can have evidence

10 and I can hear it; and the opposing party can have an

11 opportunity to respond what it is that you are going to

12 suggest.

13     Do you want to orally just give me what you think

14 is happening, and I'll be prepared --

15     MR. WARNER:  So Your Honor, when the Court issued

16 its Temporary Restraining Order on December 5th, they came

17 and they were not allowed to grade or shave the bank

18 anymore, okay?

19     THE COURT:  All right.  This Order -- let me --

20 this Order was an Order that was provided to the Court by

21 agreement of the parties.

22     MR. WARNER:  That is correct, Your Honor.

23     THE COURT:  So I didn't make any --

24     MR. WARNER:  Absolutely agree with that, yes.

25     THE COURT:  Right.  So this is what you-all agreed

1  to, and I remember there was no shaving of the bank.

2         MR. WARNER:  Yeah, no shaving agreed.

3         THE COURT:  But they could seed it.

4         MR. WARNER:  So they wanted to seed the section

5  that had already been graded.

6         THE COURT:  Uh-huh.

7         MR. WARNER:  Because even they appreciate the fact

8  that it's unguarded right now and they need to get some seed

9  in there --

10         THE COURT:  Yeah, sure.

11         MR. WARNER:  -- to hold it together, okay?

12         So what happened was we had told the Court we

13  believe the bank was the vertical structure, and then

14  horizontal probably belonged to the landowner, okay?

15         THE COURT:  Uh-huh.

16         MR. WARNER:  So what they have done is they've

17  left a four-to-five foot strip and then they literally have

18  dug out behind that and graded behind that, and now we've

19  got an unprotected bank that in a flood event is going to

20  just completely give way.

21         And that's -- you know, are they grading the bank?

22  No, but they've completely weakened behind our bank now in

23  anticipation that this model, which they can't produce to

24  us, is going to somehow pass the Treat requirements.

25         THE COURT:  Well, but okay.  So is that shaving of

1  the bank?  I would think you would concede it's not.

2            MR. WARNER:  No.

3            THE COURT:  Is it trenching is permitted by the

4  Order?

5            MR. WARNER:  But not trenching that's permitted by

6  the Order, Your Honor.  But the trenching that was permitted

7  by the Order --

8            THE COURT:  Well -- what does it say?

9            MR. WARNER:  -- was to put rebar in and to lay

10 down the cable.  And this is completely separate from that

11 trench, and I can show the Court that on the video, if the

12 Court wants to see it.

13            MR. SMITH:  Your Honor, the only reason for the

14 trenching that they're doing and the way -- I mean, they're

15 digging out more than four or five feet of earth.  The only

16 reason for doing it is to shave the bank down so that when

17 they knock down that last little bit of bank, that it's

18 completely shaved down.

19            So you can't go back and repair this if there's a

20 problem with it.  What they're doing is shaving all the way

21 to the little edge of the bank, but it has nothing to do

22 with building their wall or putting rebar in for any of

23 that.  It's all for preparation of just shaving it down.

24            MR. WARNER:  That's what they're doing, Judge.

25            MR. FIELDER:  If I may, Your Honor?

1          THE COURT:  Sure.

2          MR. FIELDER:  This is on the Neuhaus land, not the

3    bank, this is on the farmer's property.  The Order entered

4    by this Court said, "Are permitted to clear and grub --

5    clear and grub, trench, comma, place rebar and conduit in

6    the trench, and seed and plant on the subject property."

7          And in no way said we only get to trench where

8    they desire.  It doesn't say we only get to trench for the

9    purposes of laying rebar, purposes of laying conduit, and as

10   the Court observed, this was the Order we agreed to.

11         And we didn't hide any of this from them.  We

12   haven't walked the property yesterday -- we're not sneaking

13   around in the dark doing this.  This was open, obvious.  We

14   talked to them about it.  They've seen videos of it.  This

15   is nothing, nothing secret, nothing untoward, and it doesn't

16   violate the Order.

17         THE COURT:  It doesn't seem to violate the Order,

18   but it seems to be something that perhaps wasn't

19   contemplated when you-all were agreeing to this and now you

20   wish -- you may seek to modify the Order, which I'm happy to

21   listen to.

22         MR. WARNER:  Your Honor, at the last hearing, they

23   said can we keep trenching?  Because we want to put the

24   rebar down and we had a discussion about that, and --

25         THE COURT:  All right.

1          MR. WARNER:  And over our objection, the Court

2    said, I'm going to allow them to dig that trench -- no

3    concrete, though, but I'm going to let them put the rebar

4    down in there, but no concrete and no wall.

5          THE COURT:  I don't remember that being over your

6    objection.  I thought you were okay with that.

7          MR. WARNER:  Judge, we did not want the trench,

8    but the Court pointed out that farmers probably dig trenches

9    on their land and that you were going to allow it.  And so

10   we said, okay.

11         And so this is the big CAT digging it out.  So you

12   allowed them to clear and grub, which I would argue is

13   cleaning of the bank, but now, they're going in and doing

14   this behind the bank.

15         THE COURT:  Okay.  You say I allowed them.  This

16   was an Agreed Order presented to the Court.  I was advised

17   this is the agreement of the United States of America and

18   the property owners and construction company that's handling

19   the project, so I didn't quibble with the language.  There

20   were some things I didn't really --

21         MR. WARNER:  (Indiscernible).

22         THE COURT:  -- honestly, I scratched my head a

23   little bit when I was reading through it.  As you'll notice,

24   I did add a few words to make sure this was -- as against

25   the Fisher parties and the Neuhaus and not the -- because

1  there was some generic Defendants language, so I just

2  clarified a little, but I didn't change anything

3  substantively, I -- as I'm reading and trying to figure out

4  what could possible go wrong, I -- you know, myself had

5  thoughts about this, but I know you-all met for hours and

6  came up with this agreed language.

7       And not to want to interfere with what you-all

8  agreed to, I simply signed it, --

9       MR. WARNER:  So Judge, maybe --

10      THE COURT:  -- but perhaps there's a few things

11 the Government needs to do, maybe seek to modify the TRO,

12 and then -- or maybe seek to hold the Defendants in contempt

13 for violating it, if you think that exists.

14      MR. WARNER:  Right.  Judge, we just want them to

15 stop doing this.

16      THE COURT:  You know, I'm happy to --

17      MR. FIELDER:  Your Honor, I talked to them before

18 the hearing.  If that's what we're here about today on his

19 end, we'll agree.  We'll stop doing that.  We will stop

20 doing that.  This is not a big deal.  We will agree to stop

21 doing that.  It doesn't violate the TRO, we had no real

22 notice of it.  It came through in an email this morning, and

23 the email said to me from the US Attorney's Office, even

24 suggested, technically this doesn't appear to be a violation

25 of the TRO.

1          It's no big deal.  If they want us to stop it,

2  we'll stop.

3          MR. WARNER:  We didn't contemplate this.

4          THE COURT:  Right.  That's what it appears that it

5  wasn't contemplated.  Fisher is --

6          MR. WARNER:  When we left the Court --

7          THE COURT:  They're offering to stop.

8          MR. WARNER:  Okay.

9          THE COURT:  I mean, can we accept -- I mean, do

10  you want to accept their offer to stop, or?

11          MR. WARNER:  I would like them to stop, Your

12  Honor, yes.

13          THE COURT:  All right.  Do you want to send me an

14  amended TRO with that --

15          MR. WARNER:  Yes, Your Honor, we would.

16          THE COURT:  -- that minor language change?

17          MR. FIELDER:  Yes.

18          THE COURT:  Okay.  Another thing you didn't have

19  in the TRO, they expire on their own, but then if I don't

20  have a hearing on a preliminary injunction, they expire on

21  their own terms, certain number of days.

22          Also, I believe to be enforceable, I need to

23  either have a bond or make a finding that a bond wasn't

24  needed.  There wasn't anything like that in there, either.

25  Again, I assumed you-all had figured it all out since it was

1  agreed to.  I didn't call you back in after 5:00 when I got

2  this Order -- proposed Order.

3          But it seemed to have a lot of problems.

4          MR. FIELDER:  If I may?

5          THE COURT:  Yes.

6          MR. FIELDER:  I know this was brought up at the

7  original hearing.  I want to reiterate this to the Court.

8          We have 70 people out there, okay?  There's stuff

9  they can do, but that's coming rapidly to an end.  We've got

10  tens of millions of dollars' worth of heavy equipment out

11  there on a $40 million project -- excavators, trucks, tanks.

12          THE COURT:  Uh-huh.

13          MR. FIELDER:  Okay.  We don't think we're wrong.

14  We do not think we're wrong at all, but if we are, we agree

15  to post a bond as long as we can go forward and start

16  pouring concrete.  We'll post a bond in the amount it will

17  cost to tear that concrete back out, okay?  We're happy to

18  agree to an Order that if we're wrong, Fisher Industries and

19  their subsidiaries will remove the wall and as far as

20  possible, restore this property, okay?

21          We need to get back to work.  We need to get back

22  to working because at this point in time, there's zero

23  evidence suggesting anything we're doing on that property is

24  going to adversely affect Mexico, Treaty relationship,

25  neighboring properties -- any of that.

1    And we want to get back to taking care of business

2 here.  So I mean, we're talking about putting up a bond to

3 secure 100 percent of the cost of restoring this property as

4 it pertains to the wall.

5    THE COURT:  All right.  I don't think we're there

6 yet, I mean, I think the Government appreciates your

7 generous offer, but let's see if we can get this hydrology

8 study done in the next few days, get this LIDAR report study

9 to the Defendants, let them plug in their numbers.  It takes

10 48 hours.  If you get it tomorrow, maybe you can have it

11 done by Monday.

12    MR. WARNER:  It's 48 hours for them to run their

13 model --

14    THE COURT:  Sure.

15    MR. WARNER:  -- and then they have to get it over

16 to us.

17    MR. FIELDER:  And then there's no time period for

18 them to review or respond.  We could be here six weeks from

19 now -- eight weeks.

20    THE COURT:  Well, I'm going to drag you back here

21 next week just to make sure we're on track here and we're

22 moving as quickly as we can.  There's a lot of moving parts

23 here, and I'm trying to balance the different interests of

24 private citizens, the United States, and the interest of our

25 sister country to the South that might be affected.

1      MR. FIELDER:  And that's why we're suggesting the

2  bond so we don't have to go through any of this.  We can

3  save all the time and energy of fussing and fighting,

4  showing for Status Conferences and arguing -- driving all

5  the way or flying all the way here to argue about

6  non-technical violations.  Let us post a bond.  We'll post a

7  bond 150 percent of the cost of pulling down that wall, if

8  we can start construction, start pouring concrete.

9      THE COURT:  Well, let the Government consider

10  that.

11      AUSA:  Your Honor, they just said -- he just said

12  -- Counsel said we will remediate to the best of our

13  ability, but we can't get it back to what it was, and that's

14  the problem.  If this does not pass the hydraulic studies,

15  then they cannot get it back to what it should be.

16      THE COURT:  Why couldn't they?

17      AUSA:  We're already lost.  This is the bank,

18  what's left.  And this is all -- all of this is just for

19  shaving to make it the way that it was in the first pictures

20  you saw, so we've already lost that much.

21      THE COURT:  Well, wait.  But why -- I mean, I

22  think what counsel is suggesting is that they'll put the

23  dirt back.  They would replant the trees and the grass that

24  were once there.  They are going to put it back --

25      (Many voices at the same time.)

1          THE COURT:  -- to where it was previously.

2          MR. WARNER:  They can't put a five-foot bank back.

3          MR. FIELDER:  We can't return -- we can't restore

4    trees that have been grubbed off this property.  We can't

5    restore plants that have been grubbed or cleared off that

6    property.  Those plants are gone.

7          We can reseed, we can replant.  But in Texas

8    (indiscernible) understand that they're talking about we

9    can't rebuild a vertical bank.  The very vertical bank down

10   on the Rio Grande that is eroding away with every storm.

11   The very vertical bank along the Rio Grande that both wakes

12   are slapping against and washing away, the very vertical

13   bank that lacks stability as opposed to a five-by-one slope,

14   the engineering approved response to wakes and clogs, the

15   stable shoreline is what we are trying to do.

16          So true, we --

17          THE COURT:  One that doesn't erode.

18          MR. FIELDER:  -- that doesn't erode, true.  It

19   will be a struggle for us to restore the horribly

20   inefficient and eroding away vertical banks that are

21   continually slumping off into the Rio Grande and you can see

22   it directly across the river from our project.  We can't do

23   that.  Those are --

24          AUSA:  Those are the vertical banks that are

25   protected by the Treaty and that's the purpose of the Treaty

1   is not to create manmade causes that are either going to

2   change the boundary line or cause deflection and erosion on

3   the Mexican side or the American side.

4          THE COURT:  But I thought the -- from the last

5   hearing, the vertical bank really isn't -- I guess where it

6   is isn't the issue.  It's not -- there can't be something

7   done that changes the international boundary.

8          And so if this design of a bank doesn't change the

9   boundary, then shaving isn't a problem.

10         MR. WARNER:  No.  It's two things.  Number one,

11  it's changing the boundary.  And number two, it's also --

12         THE COURT:  Right. Well, how is it?

13         MR. WARNER:  -- causing deflection that will cause

14  erosion on the Mexican side.  That will then eventually

15  change the boundary.

16         THE COURT:  Okay.  You say that, but counsel for

17  Fisher says absolutely the opposite.  Says this design does

18  not cause deflection or erosion.  This is sort of a beach

19  access, as you -- and much less ability to erode, to decay,

20  to fall.

21         MR. WARNER:  Counsel, Fisher and Fisher when they

22  met with the IBWC in October and were told that they needed

23  to do a hydraulic study, had done the hydraulic study to

24  show us that this would not cause those problems, we

25  wouldn't be here.  They had the opportunity to do that, to

1  come in here with their sense of bravado that we're slowing

2  them down and trying to prevent this, they've known since

3  October that they had to do the hydraulic study.  They do

4  work with IBWC in other places.  They know the requirements.

5       THE COURT:  Sure.  But nobody here -- I mean, I

6  hear a bunch of claims by both sides, I don't know what the

7  reality is, whether this engineering design is a more

8  stable, better, less eroding design, or whether the vertical

9  shoreline that currently exists is a more stable design.

10       MR. WARNER:  That's why you run a model.

11       MR. FIELDER:  You run a model.

12       MR. WARNER:  You run a model.  You show the cross

13  sections and then you go to the IBWC and if it truly is

14  better, you show the IBWC.  Look, it's even better, and then

15  maybe IBWC says we don't object.

16       THE COURT:  Right.  I'm skeptical as to

17  everybody's claims, so no offense, but I don't really

18  believe anybody because that's just my nature.  I'm

19  skeptical of everything anybody ever tells me.

20       So, but look, let's get this back on track.  So

21  the purpose of this hearing was to make sure we're moving as

22  quickly as we can in getting to the IBWC the hydrology

23  information that was required of them.  Some information has

24  been given.  What is lacking is an analysis using this LIDAR

25  study.

1    I expect the Government to produce that LIDAR

2  study.  It's in their possession.  It's required by our

3  Civil Rules of Procedure to do so under Rule 26, and

4  therefore, I expect them to provide that to Fisher

5  Industries as quickly as possible.

6    I understand, a bit large behemoth bureaucracy is

7  it's sometimes difficult to get things done quickly with

8  layers of approval, and so I'll just ask the Government to

9  be as expeditious as possible in getting that, and if it

10  isn't provide by at least, what, Monday?  Tuesday?  Then

11  I'll enter an Order requiring it with a very short timeline.

12    If the only impediment in providing it is they

13  insist there be a Court Order requiring its disclosure,

14  somebody can let the Court know that.

15    MR. WARNER:  We'll do that, Your Honor.

16    THE COURT:  I know sometimes that's an agency or

17  party would like to have that.  I'm happy to do that.

18    Okay.  So that's number one.  Let's try to get it

19  by Monday or Tuesday.  Let's shoot for Monday, but if not,

20  Tuesday.

21    MR. FIELDER:  Tuesday?

22    THE COURT:  Yes.

23    In the interim, if the parties could agree on this

24  modification, I think the Fisher Defendants offered to stop

25  doing this sort of trenching, if you-all want to enter an

1 | Amended Restraining Order, I'm happy to do that.  Please

2 | agree on a date which it expires.

3 | MR. WARNER:  Yes, Your Honor.

4 | THE COURT:  If the bond is not needed, probably

5 | it's not because the Government is large enough they could

6 | afford to pay any damages.  I don't really think the

7 | Government needs to put up a bond, but --

8 | MR. WARNER:  I believe that's the law, case law,

9 | Your Honor.

10 | THE COURT:  Okay.  So to me we just need to --

11 | MR. WARNER:  Okay.

12 | THE COURT:  It was just a question of mine whether

13 | we needed to address that.  It's normally required.

14 | So if you'll enter -- if you-all come to some

15 | Agreed Restraining Order, then I'll just enter that and then

16 | we'll regroup here next week.  Yeah, next week is --

17 | Wednesday or Thursday of next week?  You're welcome to

18 | attend by phone, although you know, maybe it's better that

19 | you be here anyway.

20 | MR. WARNER:  Would the Court entertain Wednesday?

21 | THE COURT:  Yeah, Wednesday works --

22 | MR. FIELDER:  I've actually got some depos I've

23 | got to take on Wednesday.

24 | THE COURT:  Sure.

25 | MR. FIELDER:  Thursday works much better for me.

1          THE COURT:  That's exactly a week from today.

2          MR. WARNER:  Yes, I --

3          THE COURT:  Does that work with you, Mr. Warner?

4          MR. WARNER:  I have a border wall meeting in

5   Fort Worth, Your Honor, that's -- I mean, I need to attend

6   that.

7          THE COURT:  Well, you need to.  Could somebody

8   else cover this for you?

9          I mean, I could also patch you in by phone -- by

10  Skype.

11      (Many voices at the same time.)

12         THE COURT:  I mean, if you could break from your

13  meeting, I can patch you in.

14         MR. WARNER:  Okay.  I can certainly call in, Your

15  Honor.  I may be tied up to the mediation.

16         THE COURT:  You're going to mediation?

17         MR. WARNER:  I think.

18         THE COURT:  Mr. Smith?

19         MR. SMITH:  We'll get it figured out, Your Honor.

20         MR. WARNER:  Yeah.

21         THE COURT:  Well, I don't want to handicap you.

22         MR. WARNER:  Yeah, one of us will be here.

23         THE COURT:  All right.  It sounds like everybody's

24  got very important things to do next week and it's really

25  the last week before the holidays, so we need to be as

1  expeditious as we can.

2       Again, hopefully the studies get turned over.

3  You-all can tell me things are moving along, no need for the

4  hearing. We think we can get this done or worked out --

5  tell me that if that's where you are. I can then bump the

6  hearing a few more days if you feel like, you know, things

7  are progressing, --

8       MR. FIELDER: We'd love to do a bond.

9       THE COURT: All right.

10      MR. FIELDER: We'd do a bond. I agree -- I

11 suggest to the Court, we may -- we could have a $500,000

12 bond on file with this Court by Friday.

13      MR. WARNER: Judge --

14      THE COURT: 500,000 doesn't seem like very much.

15      MR. FIELDER: That's the beauty of our design.

16 The ease of which is it can be removed. And that's what's

17 going to be adopted nationwide.

18      THE COURT: All right.

19    (Laughter.)

20      THE COURT: Yes. All right. So you-all are free

21 to work some -- talk about that amongst yourselves if

22 you-all want to pursue that.

23      Otherwise, be back here same time, 1:30, next

24 Thursday. If you-all want to move that a little bit by

25 agreement, I'm happy to do that.

1       Remember, though, the following week there's a

2  holiday that a lot of us celebrate, the Court included.

3       MR. WARNER:  Understood, Your Honor.

4       THE COURT:  So otherwise, I'll hope to see you

5  back here by then.  If you haven't produced the study --

6       MR. WARNER:  Understood.

7       THE COURT:  -- if somebody could let me know on

8  Tuesday that it still hasn't been produced, then I'll enter

9  an Order.

10       MR. WARNER:  We'll do.

11       THE COURT:  Okay.  And maybe also let -- I may get

12  you-all in on a conference call to figure out, well, where

13  are we and what kind of Order is needed before I just enter

14  something?

15       MR. WARNER:  Okay.

16       THE COURT:  All right.  Thank you all for being

17  here this afternoon.

18       MALE VOICE:  Thank you, Judge.

19       THE COURT:  Good luck working out this language.

20  I'll look for the proposed Amended Order here in a couple of

21  hours?

22       MR. WARNER:  Yes.

23       THE COURT:  Or an hour?  Are you getting on a

24  flight?

25       MR. FIELDER:  I'm jumping on a flight.  How

 1  about --

 2          THE COURT:  In the morning?

 3          MR. WARNER:  What time is your flight?

 4          MR. FIELDER:  We can work that out.  I don't want

 5  to waste the Court's time.

 6          THE COURT:  Sure.

 7          MR. WARNER:  It may be morning, Your Honor, but

 8  we'll get one filed.

 9          THE COURT:  All right.  So let me ask if you know

10  do I need to stick around here until -- wait till I get one,

11  whatever time it is, or I'll just leave at the normal

12  business hour?

13          MR. WARNER:  I would prefer to under-promise and

14  over-deliver.

15          THE COURT:  Sure.

16          MR. WARNER:  I'd like to tell you that you'll have

17  it by 9:30 tomorrow morning.

18          THE COURT:  Perfect.  All right.  Thank you-all

19  very much.

20          MR. WARNER:  All right.

21          THE COURT:  You're excused and we're in recess.

22          COURTROOM DEPUTY:  All rise.

23      (Proceedings adjourned at 2:14 p.m.)

24

25                          *  *  *  *  *

1        *I certify that the foregoing is a correct*

2  *transcript to the best of my ability produced from the*

3  *electronic sound recording of the proceedings in the above-*

4  *entitled matter.*

5  */S/ MARY D. HENRY*

6  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9  *JTT TRANSCRIPT #61339*

10  *DATE FILED:  DECEMBER 13, 2019*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25